**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Sarkesian, | No. CV-10-08024-PCT-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, | |
| Defendant. | |

Plaintiff Patricia Sarkesian challenges the Commissioner's denial of her application for Social Security benefits. Sarkesian filed an application for benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, on September 14, 2004, alleging a disability onset date of September 1, 2004. The first administrative hearing was held on June 28, 2006. Administrative Law Judge Ronald Robins ("ALJ Robins") presided over the hearing and found that Sarkesian retained the capacity for a reduced range of sedentary work, including her past relevant work as a customer service representative, and was therefore not disabled. The Appeals Council vacated that decision on April 14, 2007, and remanded the matter for another hearing and decision due to the submission of new evidence. A hearing was held on March 10, 2009, before ALJ Ronald Dickinson ("the ALJ") who, by written decision dated March 10, 2009, again found that Sarkesian could perform her past relevant work as a customer service representative and was not disabled. Sarkesian again requested review, but

on December 3, 2009, the Appeals Council declined to set aside the ALJ's decision, rendering it the Commissioner's final decision.

## I.     Background

Sarkesian was fifty-nine years old as of the alleged onset of her disability on September 1, 2004, and sixty-five years old as of December 31, 2009, the oldest age at which she could be evaluated in connection with her Title II claim. Sarkesian has a highschool education and one semester of college. For twenty-eight years before the onset of her disability, she worked as a customer service representative for a propane gas company. Her duties entailed answering phones and taking purchase and service orders. She left that job because, after a reorganization, the company replaced her, and she was only offered a part-time position without health benefits. From April to December 2004, Sarkesian worked part-time as a check-out clerk at a grocery store. She was laid off from that job on December 2004.

In January 2005, Sarkesian had two seizures which required hospitalization. Sarkesian has been diagnosed with fibromyalgia and lupus, which she alleges make it difficult for her to sit or stand for very long, and with severe sleep apnea. Sarkesian has also been diagnosed with an adjustment disorder and anxiety.

## II.    Standard of Review

The Court will disturb a denial of benefits only if the decision "contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). The substantial evidence standard is somewhere between a scintilla and a preponderance. *See Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam). Under this standard, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotations omitted). An ALJ's decision will not be reversed for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential. *Id.*

## III. Discussion

The Social Security Act defines "disability" as the inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An ALJ applies a five-step sequential review process in determining whether a claimant is disabled. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). If the ALJ determines that the claimant is disabled or not disabled at any step, the ALJ does not continue to the next step. *Id.*

The first step is not at issue. The parties agree that Sarkesian has not engaged in substantial gainful activity since September 1, 2004, the alleged onset date of her disability. *See* 20 C.F.R. § 416.920(a)(4)(I). At step two, the ALJ found that Sarkesian had fibromyalgia, back pain radiating to the lower extremities, hypertension-controlled, lupus-controlled, and seizures-controlled, which are severe when considered in combination. The ALJ also found that Sarkesian's medically determinable mental impairment of anxiety disorder with worry and stress did not cause more than a minimal limitation in her ability to perform basic mental work activities and was therefore not severe. Sarkesian contests that finding. At step three, the ALJ found that Sarkesian did not have an impairment or combination of impairments that met or equaled an impairment set forth in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P., app. 1. The parties do not dispute this finding.

Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's residual functional capacity. *See* 20 C.F.R. § 416.920(e). Sarkesian contests the ALJ's determination of her residual functional capacity. At step four, the ALJ must determine whether, in light of the claimant's residual functional capacity, the claimant can engage in substantial gainful activity performed in the past. *See* 20 C.F.R. § 404.1520(e). The ALJ determined that Sarkesian was capable of performing her past relevant work as a customer service representative, and as a monetary/account information clerk, and that such work did not require the performance of work-related activities precluded by Sarkesian's

1  limitations. Sarkesian contests this finding based on the ALJ's allegedly erroneous residual
2  functional capacity determination. Because the ALJ found that Sarkesian could perform her
3  past relevant work, she was found not to be disabled under the Social Security Act.

### A. No Severe Mental Impairment

5  Sarkesian contends that the ALJ erred by improperly rejecting some of the medical
6  findings that support her claim that she has a mental impairment that is severe. An
7  impairment or combination of impairments is not severe if it does not significantly limit the
8  claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 1521(a). Basic
9  work activities are the abilities and aptitudes necessary to do most jobs. *Id.* § 1521(b). The
10 examples of basic work activities relevant here are the abilities to understand, carry out, and
11 remember simple instructions; use judgment; respond appropriately to supervision, co-
12 workers, and usual work situations; and deal with changes in a routine work setting. *Id.*
13 Under Social Security Ruling 85-28, a determination that an impairment is not severe
14 requires a careful evaluation of the medical findings which describe the impairment and an
15 informed judgment about its limiting effects on the individual's physical and mental ability
16 to perform basic work activities. The step two inquiry is a *de minimis* screening device to
17 dispose of groundless claims. *See Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

18 Psychiatrist Steven Patrick, Ph.D., evaluated Sarkesian on April 12, 2005, on referral
19 by the Arizona Department of Economic Security Disability Determination Service
20 Administration. After a review of Sarkesian's medical records and a clinical interview, Dr.
21 Patrick diagnosed her with Adjustment Disorder with Anxiety and assessed a global
22 assessment of functioning ("GAF") of 60. According to the Diagnostic and Statistical
23 Manual of Mental Disorders, a GAF of 60 indicates moderate symptoms. AMERICAN
24 PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
25 DISORDERS, 30 (4th ed. 1994). Dr. Patrick also completed a form that rated Sarkesian's
26 limitations in twenty different areas that fall under four categories: understanding, carrying
27 out, and remembering; sustained concentration and persistence; social interaction; and
28 adaptation. In nineteen out of the twenty areas, Dr. Patrick found that Sarkesian had mild

1  or no limitations.  Dr. Patrick found that Sarkesian was moderately limited in her ability to
2  perform activities within a schedule, maintain regular attendance, and be punctual within
3  customary tolerances based on "fatigue related to lupus."

4         Sarkesian argues that the ALJ "acknowledged Dr. Patrick's examination," but
5  addressed "only the doctor's more benign findings," and "wholly failed to address Dr.
6  Patrick's findings of moderate limitations in three areas of mental functioning . . . [i.e.], the
7  need to perform activities within a schedule, maintain regular attendance, and to be
8  reasonably punctual."  Sarkesian claims that Dr. Patrick's opinions were corroborated by
9  consistent findings by Dr. James Arthur, M.D., Sarkesian's treating physician, that she
10 suffered anxiety and depression that worsened her symptoms and interfered with her ability
11 to endure workplace stresses.

12        In making his step two determination, the ALJ found that Sarkesian suffered from a
13 medically determinable impairment of anxiety disorder with worry and stress, but that her
14 impairment did not cause more than a minimal limitation in her ability to perform basic
15 mental work activities.   The ALJ also acknowledged that Sarkesian was "not very good at
16 handling stress and changes to her routine."  In making these findings, the ALJ implicitly
17 agreed with Dr. Patrick's diagnosis of  "adjustment disorder with anxiety."  The record also
18 supports the ALJ's finding that Dr. Patrick's opinion was that Sarkesian's "mental status
19 reflected mild problems with concentration and delayed recall," for while Dr. Patrick noted
20 that Sarkesian was moderately limited in her ability to perform activities within a schedule,
21 maintain regular attendance, and be punctual within customary tolerances, he based that
22 opinion on Sarkesian's fatigue related to lupus, not on her anxiety disorder.   With respect
23 to every other functional area, Dr. Patrick opined that Sarkesian had no limitations or only
24 mild limitations.  Therefore, the ALJ's interpretation of Dr. Patrick's opinion was rational
25 and must be upheld.  *See Burch*,  400 F.3d at 679.

26        Sarkesian next contends that Dr. Patrick's alleged conclusion that Sarkesian's anxiety
27 limits her ability to engage in basic work activities is corroborated by Dr. Arthur's  notes,
28 which state that Sarkesian showed symptoms of depression and anxiety.  However, the mere

- 5 -

presence of an impairment does not necessarily establish its severity. *See* 20 C.F.R. § 404.1529(b). Sarkesian's citations to Dr. Arthur's notes support her contention that Dr. Arthur opined that Sarkesian had anxiety and depression. But Dr. Arthur's notes do not indicate how Sarkesian's anxiety and depression affected her ability to carry out simple instructions, exercise judgment, respond to supervision and co-workers, or deal with changes in a routine work setting. The ALJ therefore did not err in finding that Sarkesian's mental impairments were not severe.

### B. Residual Functional Capacity Determination

Sarkesian also contends that the ALJ improperly rejected the opinion of her treating physician, Dr. Arthur. As a general rule, more weight should be given to the opinion of a treating source than to the opinions of physicians who do not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Where a treating or examining physician's opinion is not contradicted by another physician, it may be rejected only for clear and convincing reasons. *Id.* If the treating or examining physician's opinion is contradicted by another physician , the treating or examining physician's opinion may not be rejected without specific and legitimate reasons supported by substantial evidence in the record for doing so. *Id.* The opinion of any physician, including a treating physician, need not be accepted, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray*, 554 F.3d at 1228.

### 1. Medical Evidence

Dr. Arthur, M.D., a family practitioner, has been treating Sarkesian since the late 1980s. In November and December 2003, Sarkesian complained of generalized myalgias and fatigue, which were believed by treating rheumatologist, Dr. Kenneth Epstein, M.D., to stem from systemic inflammatory arthritis or lupus. Dr. Epstein also diagnosed Sarkesian with lupus anti-coagulant syndrome and hypertension. He prescribed Plaquenil (for lupus) in addition to medications that Dr. Arthur had already prescribed: Coumadin, a blood thinning medication for the lupus anticoagulant syndrome, Phenobarbital, for headaches, Norvasc for hypertension, and Lexapro for depression.

On January 16, 2004, Sarkesian saw Dr. Epstein for a follow-up. He noted that she had a good response to her medication with resolution of her mild inflammatory arthritis. In a letter addressed to Dr. Arthur, Dr. Epstein wrote that Sarkesian had "a mild systemic inflammatory syndrome, characterized by arthritis, positive ANA, and fatigue, as well as the anticardiolipin antibody syndrome," all of which seemed to be "doing well on Planquenil and Coumadin." She had also developed left leg pain, beginning in her gluteal region, with radiation down to the left ankle and foot, suggesting that she had a radicular problem. Dr. Epstein recommended physical therapy.

The next day, Sarkesian sought emergency care for her left leg pain. The physician diagnosed acute sciatica and left lumbar radiculopathy secondary to L5 nerve root compression and prescribed Neurontin for nerve pain. On January 22, 2004, Dr. Arthur noted that Sarkesian had not improved on Neurontin. X-rays of her lumbar spine revealed degenerative disease at T11 and T12 with Grade I spondylolisthesis at L4-5. Dr. Arthur ordered an MRI and prescribed Skelaxin, a muscle relaxant, and Oxycodone for pain.

In March 2004, Sarkesian reported improvement in her back pain after three chiropractic treatments, with no other specific symptoms. On June 1, 2004, she reported chronic fatigue, sleeping ten hours a day, and sometimes more. Dr. Arthur diagnosed chronic fatigue and lupus arthritis. He also detected "an issue of anxiety" in her presentation. In August 2004, Dr. Arthur noted that Sarkesian continued to complain of "generalized malaise, fatigue and weakness with primarily noted joint pain and low back pain, which is not radicular." He again diagnosed lupus arthritis, generalized myalgias, and chronic fatigue.

On August 31, 2004, Dr. Epstein noted that Sarkesian was doing well but had been having pain in her back for a month or two. Dr. Epstein recommended back x-rays, which showed degenerative disc disease at L4-5 and facet anthropathy at L5-S1. He recommended she taper Predisone and begin taking Celebrex, a nonsteroidal anti-inflammatory medication.

Sarkesian alleged a disability onset date of September 1, 2004. On October 25, 2005, Dr. Arthur completed a questionnaire regarding the functional impact of Sarkesian's conditions. He opined that she could lift and/or carry no more than ten points frequently and

1 twenty pounds occasionally, that she could stand and/or walk more than two but lest than six
2 hours a day, and sit without limitation with the need to alternate between sitting and standing
3 every 20 to 30 minutes. She could do no more than occasional climbing, balancing, stooping,
4 kneeling, crouching, crawling, and reaching. Sarkesian's need to alternate between sitting
5 and standing could be accommodated during normal breaks, but working an eight-hour day
6 would be too much for her.

7 On November 1, 2004, Sarkesian reported persistent fatigue, decreased grip strength,
8 and non-specific myalgias. An exam revealed fibromyalgia trigger points "in the usual
9 spots." Dr. Arthur diagnosed fibromyalgia, depression/anxiety, lupus anticoagulant, and
10 rheumatoid arthritis. He recommended she be placed on "full disability."

11 On January 8, 2005, Sarkesian was hospitalized following two seizures. A CT of her
12 brain was remarkable, and an MRI showed non-specific small vessel ischemic white matter
13 changes. She was treated with Dilantin and Depakote. On January 14, 2005, Dr. Arthur
14 noted that Sarkesian's lupus may have played a role in her seizures. An exam showed
15 "general trigger points consistent with her fibromyalgia." On January 20, 2005, Dr. Epstein
16 examined Sarkesian and found "no evidence of obvious lupus activity." He suggested she
17 continue her medication and said he would repeat lupus serologies in several weeks. On
18 January 30, 2005, Sarkesian sought emergency care for a broken ankle.

19 On February 8, 2005, neurologist Steven Hoover, M.D., noted Sarkesian had not had
20 any further seizures, but was tolerating her medications poorly with complaints of
21 drowsiness, dry mouth, hair loss, and insomnia. She was nevertheless alert and interactive
22 with normal fluent speech and comprehension. On February 10, 2005, Dr. Epstein wrote that
23 Sarkesian "seems to be doing fairly well, although she [was] very lethargic and tired all the
24 time." He noted that "some of this could be related to her seizure medication." She also had
25 "no flare up of her rheumatoid arthritis, which [was] under fair control." He diagnosed her
26 with "seizure disorder, gastritis, lupus anticoagulant, rheumatoid arthritis, chronic fatigue,
27 hypothiroidism," among others.

28 A state agency physician completed a physical residual functional capacity assessment

on March 29, 2005. He found that Sarkesian could lift/carry 20 pounds occasionally and 10 pounds frequently, and stand/walk and sit about six hours each in an eight-hour day.

On April 12, 2005, Sarkesian saw Steven Patrick, Ph.D., for a psychological evaluation. Dr. Patrick stated that her medical records indicated degenerative disc disease, joint pain and fatigue, chronic pain syndrome, HTN, hypothiroidsm, and lupus." Sarkesian's chief complaint was her lupus. She indicated that she had frequent contact with her children and grandchildren, and had lots of friends and was active with them. She was not currently involved in community activities. Her husband prepared all meals and did the chores. She said she tried to do chores but could no longer do so because she was too tired. She had started to walk in order to recover from her broken ankle, and had been extending the length of the walk maybe for one mile. She would go shopping with her husband and lean on a cart in the store. She also said that she would start her day by eating, showering, and dressing. On a good day, she would make her bed, whereas on a bad day, she would not even dress, stay in a robe, and sit on the couch feeling very tired. On a good day, she would work on the laundry, which "took time." She would either vacuum or dust, and then go for a walk. Dr. Patrick found that Sarkesian was either not limited or only mildly limited in every area of work-related mental functional limitations, except the ability to perform activities within a schedule, maintain regular attendance, and be punctual, where he found she had moderate limitations due to her lupus-related fatigue.

In July 2005, Dr. Arthur sent Sarkesian for a sleep study. The study showed "very severe obstructive sleep apnea" with associated moderate hypoxemia, severe sleep fragmentation, poor sleep continuity and consolidation, and markedly elevated light sleep. A continuous positive airway pressure (CPAP) machine was recommended, but Sarkesian could not afford it. On August 18, 2005, Dr. Arthur recommended Sarkesian wear arch supports for her complaints of foot pain. He noted that Sarkesian had told him that she had not gotten a CPAP machine because her insurance was "in limbo."

On February 21, 2006, Panna Shah, M.D., a neurologist, noted that Sarkesian had not had any more seizures, but had significant weight gain possibly due to Depakote. He

- 9 -

1  changed her seizure medication to phenobarbital, noting she needed to be on seizure
2  medication for at least another year.
3      On March or April 2006, Sarkesian saw Dr. Epstein with a primary complaint of back
4  and leg pain with no radicular symptoms.  Dr. Epstein thought her pain was "more a
5  reflection of degenerative arthritis of the low back" than of active lupus.  He found no "real
6  evidence of inflammation."  He recommended exams to assess lupus activity and physical
7  therapy.
8      In a letter dated May 17, 2006, Dr. Arthur wrote that he had treated Sarkesian for the
9  past 15 years, and that over the last 5 years, her condition had significantly deteriorated.  He
10 said she had a complex medical history.  Her "work-up was significant for hypercoagulable
11 state due to lupus anticoagulant."  She also had other problems that "contributed to her
12 current disability," including significant and progressive fibromyalgia, chronic fatigue,
13 seizure disorder, and obstructive sleep apnea.  He stated that Sarkesian had "positive
14 laboratory findings to support her lupus and lupus anticoagulant problem."  He also said
15 Sarkesian had been without insurance for quite some time.  This made her regular scheduled
16 visits difficult for her to keep up, "which she ha[d] done religiously," and also altered her
17 optimum treatment because of the expense of medications and the need for a CPAP machine.
18 Dr. Arthur opined that Sarkesian's physical activities were severely limited.  She was unable
19 to perform any significant amount of lifting, reaching "and even fine motor movements have
20 been affected by her condition.  Her fibromyalgia also caused "significant shoulder, arm and
21 upper body discomfort with any prolonged use of her arms in an outstretched manner."  She
22 also had severe limitations associated with her lower back, not only from fibromyalgia, but
23 from lumbar degenerative arthritis and degenerative disk disease.  This required her to
24 constantly change from a sitting position to walking to sometimes lying down.  He opined
25 that her level of pain was between 7 and 8 on a scale of 1 to 10, and her level of fatigue a 9
26 or 10 in a scale of 1 to 10.  He opined that she could frequently lift up to 10 pounds, and
27 frequently carry up to 5 pounds, and occasionally carry up to 10 pounds.  She had moderate
28 limitations in grasping, using fingers or hands for fine manipulation, and moderate limitations

in reaching with her left arm. Dr. Arthur also stated that Sarkesian could not work a full eight hour day and would have to rest for several hours or days if she attempted to do so. Her ailments would also make it likely that she would be absent from work more than three times each month. He opined that she was totally disabled, and that even a sedentary job would worsen her fatigue and pain.

On December 6, 2006, Sarkesian complained to Dr. Arthur of worsening depression, chronic fatigue, daytimes somnolence, and nocturnal insomnia. On March 27, 2007, Dr. Arthur noted that Sarkesian's fatigue was "quite severe," and that her fibromyalgia, neck pain, and headaches had worsened. He prescribed a different anti-depressant (Rameron) and told Sarkesian that she could take more Oxycodone for her pain. He noted that Sarkesian was "in desperate need of being on a CPAP." Dr. Arthur's July 16, 2007 examination was unchanged. He noted that her "usual major complaints are that of pain control, which is fairly well covered with current chronic pain medication regime[n]." Sarkesian complained of shortness of breath with exertion. Her fibromyalgia persisted, but there were no areas of significant swelling and no specific joint swelling or pain noted. In October 2007, Dr. Arthur stated that Sarkesian continued to struggle with most of her medical issues and was still quite debilitated from her sleep apnea and excessive daytime fatigue. She also would become very weak and tired after short periods of time due to her fibromyalgia. He stated that, "medically speaking" she was "without medical doubt, disabled from her usual or any occupation." She was still taking anticoagulation and anti-seizure medication.

On February 13, 2008 Dr. Arthur noted that Sarkesian had been feeling cold all the time for the previous three weeks. Her fibromyalgia trigger points were still significantly active but unchanged from usual exam as far as location. She had no joint swelling, redness, or warmth.

On February 19, 2008, Sarkesian saw Dan Moritz, Ph.D., for a psychological evaluation. Dr. Moritz wrote that Sarkesian was articulate and was able to respond to his questions without fragmentation, confusion, or blocking. She seemed "quite talkative and energetic," and did not appear to have any pain until she got up to go to lunch.

1     Sarkesian told Dr. Moritz that she could spend a couple of hours a day reading. She
2 said she liked to do crossword puzzles. She used to crochet and sew in the past but could no
3 longer do so because her hands were "so messed up." She belonged to a car club specializing
4 in antique cars and would sometimes go out to dinner with friends from the club. During the
5 day, she would get up, make her bed, take a shower, do housecleaning, and often get out to
6 take her dogs for a walk. She said she could not "sit at home." She said she did chores with
7 her husband but could not get down on her hands and knees nor lift anything heavy. She
8 took care of her own hygiene and showered every morning. She did not cook since her
9 seizure in 2005. She also said that she liked to take the dogs out in the woods to run if the
10 weather was nice, and that if the weather was nice, she would be gone all day because she
11 liked the outdoors. She and her husband liked to walk and explore wilderness areas and have
12 picnic lunches out. She said she had been taking hydrocodone for the past year for chronic
13 pain caused by fibromyalgia, and could take one every four hours if needed, but did not take
14 it as often as every four hours. Dr. Moritz's prognosis was that Sarkesian's fibromyalgia and
15 chronic pain would continue to "significantly limit her ability to engage in social activities,
16 recreation, or work." He believed she was significantly better than her record indicated she
17 was right after having the seizures in January 2005, but he believed she continued to have
18 significant problems with pain and fatigue, and those problems were intensified by stress.
19 Dr. Moritz questioned Sarkesian's decision not to drive as she had not had any seizures since
20 2005.

21     On July 1, 2008, Dr. Arthur's examination was unchanged, although he noted that
22 blood work showed evidence of mild renal insufficiency. On August 19, 2008, Sarkesian
23 saw Thomas Newmann, M.D., for a follow-up regarding her blood work. He found that
24 Sarkesian had early chronic kidney disease related to her history of hypertension, lupus, and
25 lupus anticoagulant, but that she did not have any significant disease that currently required
26 treatment. He concluded that she was "stable," and that further work-up could wait until she
27 had insurance. On November 6, 2008, Dr. Neumann again opined that he would wait until
28 Sarkesian had insurance to do further work-up.

1  On January 12, 2009, Dr. Arthur increased Sarkesian's pain medication dosage upon
2  her complaints of worsening pain and fatigue.

### 2. Analysis

Where, as here, a treating physician's opinion is contradicted, the ALJ may reject that opinion by providing specific and legitimate reasons supported by substantial evidence in the record. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Sarkesian first contends that the ALJ improperly objected to Dr. Arthur's having rendered a "disability" decision at all. The ALJ correctly noted that opinions on the ultimate issue of disability are reserved to the Commissioner. *See* 20 C.F.R. §404.1527(e). The ALJ did not indicate that he was rejecting Dr. Arthur's opinion on that basis. It was not improper for the ALJ to correctly state the rule concerning opinions on the ultimate issue of disability in his decision.

Sarkesian next contends that the ALJ could not reject Dr. Arthur's opinion merely because he included Sarkesian's lupus and seizure disorders among her disabling impairments. However, as the Commissioner points out, it is not the presence of an impairment, but the functional effect an impairment has on the ability to do work, that entitles a claimant to benefits. *See Barnhart v. Walton*, 535 U.S. 212, 214 (2002). The ALJ noted that although Dr. Arthur listed lupus among Sarkesian's impairments, Dr. Epstein, a treating rheumatologist, repeatedly found that Sarkesian's lupus was stable and not causing symptoms. It was not improper for the ALJ to credit the opinion of a treating specialist over that of a general practitioner. *See Smolen*, 80 F.3d at 1285. Similarly, it was not improper for the ALJ to conclude that Sarkesian did not have any functional impairments from her seizure disorder in light of the fact that several doctors stated that she had not had any seizures since 2005.

It was also not error for the ALJ to conclude that Sarkesian's sleep apnea was "significant" but untreated. The record indicates that Sarkesian was unable to obtain treatment for her sleep apnea due to a lack of resources. An ALJ may not reject a claimant's complaints for lack of treatment where the record establishes that a claimant cannot afford the treatment. *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir.

1  1999). Here, however, the ALJ did not reject Sarkesian's complaints of sleep apnea because
2  that condition remained untreated. Rather, the ALJ found that Sarkesian's sleep apnea was
3  "significant," but that it was not disabling. That conclusion is supported by medical reports
4  that consistently indicated that Sarkesian was alert, and by Dr. Moritz's observation that
5  Sarkesian "seemed quite talkative and energetic."

6  Sarkesian contends that the ALJ improperly found fault with Dr. Arthur's inclusion
7  of fibromyalgia in his assessment of Sarkesian's residual functional capacity. However, as
8  with Sarkesian's sleep apnea, the ALJ did not discredit Dr. Arthur's opinion that Sarkesian
9  had fibromyalgia. Instead, the ALJ concluded that her fibromyalgia was not disabling.
10 Although Sarkesian consistently tested positive for fibromyalgia trigger points, her physical
11 examinations showed that she was alert and in no acute distress from pain, had a normal gait,
12 normal posture, full range of motion in all joints and extremities, intact sensation, normal
13 reflexes and normal muscle tone and bulk.

14 Sarkesian's activities of daily living further undermined her claim of disabling pain
15 from fibromyalgia. The mere fact that a claimant carries on certain daily activities does not
16 detract from her credibility as to her overall disability because those activities may not be
17 transferrable to a work setting. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).
18 However, normal activities of daily living, such as cooking, house cleaning, doing laundry,
19 and helping manage finances can support an adverse credibility determination. *Stubbs-*
20 *Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008). The ALJ noted that Sarkesian told
21 Dr. Moritz that she took care of her own hygiene. She would regularly get up, make her bed,
22 take a shower, and do housecleaning. She also indicated that she liked to take her dogs for
23 a walk in the woods, and if the weather was nice, "she would be gone all day because she
24 liked the outdoors." She and her husband liked to explore wilderness areas and have picnic
25 lunches out. She also mentioned that although she could take pain medication once every
26 four hours, she did not take her medication that often. It was not improper for the ALJ to
27 conclude that Sarkesian's ability to engage in all of these activities detracted from her claims
28 of disabling pain.

Lastly, Sarkesian argues that the ALJ had no basis for reasoning that Dr. Arthur's functional capacity assessments reflected an interest in finding Sarkesian to be able to qualify for benefits. An AJL may give less weight to the opinion of a physician who is merely an advocate for a claimant. *See Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992). The record indicates that Dr. Arthur was understandably concerned and somewhat exasperated by Sarkesian's inability to obtain adequate medical care due to her lack of resources. While this may not have caused Dr. Arthur to exaggerate Sarkesian's symptoms, in light of the inconsistencies between Sarkesian's claims of disabling symptoms and her daily activities and other medical evidence in the record, it was not unreasonable for the ALJ to conclude that Dr. Arthur may have been influenced by his desire to help Sarkesian obtain the best treatment possible.

The Court therefore finds that the ALJ did not err in giving little weight to Dr. Arthur's opinions.

IT IS ORDERED affirming the final decision of the Commissioner of Social Security denying Sarkesian's disability benefits.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants against Plaintiff and that Plaintiff take nothing. The Clerk shall terminate this action.

DATED this 20th day of September, 2010.

_____
Neil V. Wake
United States District Judge